[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 19, 2010
JOHN LEY
ACTING CLERK

No. 08-14795
Non-Argument Calendar

_____

D. C. Docket No. 08-20231-CR-PCH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANIEL GARCIA-BARZAGA,
FREDDY CRESPO,
JORGE LUIS TORRES,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(January 19, 2010)

Before EDMONDSON, BIRCH and FAY, Circuit Judges.

PER CURIAM:

Daniel Garcia-Barzaga, Freddy Crespo, and Jorge Luis Torres appeal from their convictions for: (1) conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, ("Count 1"); (2) attempt to possess with intent to distribute cocaine, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, ("Count 2"); (3) conspiracy to commit robbery by the use of force, 18 U.S.C. § 1951(a), ("Count 3"); (4) attempt to commit robbery by the use of force, 18 U.S.C. §§ 1951(a) and 2, ("Count 4"); (5) conspiracy to use and carry a firearm during and in relation to a crime of violence and a drug trafficking crime, 18 U.S.C. §§ 924(c)(1)(A) and 924(o), ("Count 5"); and (6) using and carrying a firearm during and in relation to a crime of violence and a drug trafficking crime, 18 U.S.C. §§ 924(c)(1)(A) and 2. ("Count 6").

On appeal, Torres and Crespo argue that the district court abused its discretion in permitting the government to introduce evidence that they and other co-conspirators had committed previous robberies together. Garcia-Barzaga and Crespo argue that the district court abused its discretion by permitting a law enforcement agent to testify as to his interpretations and impressions of what certain words and phrases meant in the context of recorded conversations.

In addition, Torres and Crespo assert that the evidence was insufficient to support their convictions as to all counts. Garcia-Barzaga contends that the

2

evidence was insufficient to support his conviction as to Count 6.  Finally, Crespo argues that the district court imposed an unreasonable sentence, thereby abusing its discretion.  For the reasons set forth below, we affirm.

## I.

In 2008, a federal grand jury indicted the defendants for the six counts set forth above.  Before proceeding to trial, the government filed a motion in limine, requesting that the court permit it to introduce evidence of previous robberies committed by the defendants and several of their co-conspirators.  During pre-trial hearings, the court and the parties discussed the government's motion in limine.  Over the defendants' objections, the court  found that evidence of the defendants' previous robberies was admissible as intrinsic evidence because it explained how the defendants came to work together and rely on each other.  The court also found that this evidence was relevant to the defendants' intent in the present case, particularly since at least one defendant would likely present a defense that he was merely present when his co-conspirators gathered to prepare for the armed robbery, and was not fully aware of the conspiracy.

At trial, Erik Espinosa, an agent employed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), testified that he acted as an undercover agent in the investigation of the defendants.  Espinosa explained that he

3

had played the role of a "disgruntled drug courier working for a Colombian drug organization" who transported between 25 to 30 kilograms of cocaine at a time between a stash house and other locations. On March 3, 2008, Espinosa, a confidential informant "CI", Raul Zamora, Garcia-Barzaga, and Crespo met with each other to discuss a narcotics robbery, and Espinosa recorded the meeting. During this meeting, the parties agreed that Crespo and several armed associates would follow Espinosa to a stash house, and then rob Espinosa in his truck after he picked up the cocaine from a stash house. They noted that Espinosa would likely be accompanied by an armed guard, who would not be privy to their scheme. Crespo advised that he owned police gear, which he and his associates typically wore when they conducted narcotics robberies.

The parties played the recording of the March 3 meeting in open court. Over the defendants' objections, the court permitted Espinosa to explain what he had understood certain words or phrases uttered during the conversation to mean. Espinosa explained that, during the meeting, they used various code words for cocaine, such as "tubes," "merchandise," and "gadgets." Also during the meeting, Garcia-Barzaga had stated, "I don't know if you understand me, the price. They're like four or five and we're four on this side." In addition, Espinosa and Garcia-Barzaga had engaged in the following exchange:

4

Garcia-Barzaga:   [W]e're the ones that are going to risk our necks if there are weapons. Do you know if there are weapons there?

Espinosa:   I know already there's going to be another guy there already.

Garcia-Barzaga:   Well, you see?

Espinosa:   For sure there's going to.

Garcia-Barzaga:   I told them there's going to be two or three people and there are going to be weapons for sure. And if there are two guys, there are two weapons.

Espinosa:   Uh-huh.

Garcia-Barzaga:   Because the one in there is going to shoot.

Espinosa explained that this exchange meant that the men conducting the robbery risked violence if armed individuals were inside the stash house. Espinosa further explained that Garcia-Barzaga had been informing Espinosa that he knew how the drug business worked, and that it was likely that the cocaine would be guarded by men with weapons. On March 3, Garcia-Barzaga had also stated, "look here, in the house if there is a shooting, the police is going to come and something could happen. This has to be fast." Espinosa explained that Garcia-Barzaga meant that they had to be careful because there could be a shoot-out, and this could attract the police. When Garcia-Barzaga later stated, "if we have to shoot we're going to put everything," he meant that, if the individuals committing the robbery were

5

forced to shoot, no one guarding the stash house would come out alive.

During a subsequent meeting, Espinosa, Garcia-Barzaga, Zamora, and the CI agreed that the robbery would take place on March 12, 2008. Privately, the government agents had arranged that the CI would meet with the defendants on March 12 and then lead the defendants to an undercover warehouse, where Espinosa allegedly would be waiting for a telephone call from the Colombian drug organization concerning the location of the stash house. The agents would arrest the defendants when they arrived at the warehouse.

While conducting surveillance on March 12, Espinosa and other agents observed that Crespo and his associates, Yanko Garcia, Pedro Gallego, Armando Serrano, and Torres, met at a gas station, which was near a McDonald's. The CI, Zamora, Garcia-Barzaga, Crespo, and Serrano had a conversation at the gas station, which was recorded by the CI. During this conversation, Garcia-Barzaga instructed Crespo, Garcia, Gallego, and Serrano that, if any individual accompanying Espinosa fired a gun, they should shoot back. The CI instructed the co-conspirators that, before conducting the robbery, they should follow him to a warehouse where Espinosa was waiting for his Colombian bosses to call him and tell him the address of the stash house. While Crespo and Garcia-Barzaga followed the CI to the warehouse, Torres, Garcia, Gallego, and Serrano stayed

6

behind at the gas station. Crespo and Garcia-Barzaga were arrested when they approached the warehouse, and Torres, Garcia, Gallego, and Serrano were arrested at their meeting place near the gas station and McDonald's.

On cross-examination, Espinosa testified that no actual cocaine was used in this case, and there was no actual stash house. He conceded that he never told the defendants the address of the stash house, and never met with the defendants on March 12th so they could follow his truck to the stash house.

Mitch Jacobs, a detective employed by the Miami-Dade Police Department, testified that he had conducted surveillance in this case on March 12, 2008. When he observed the meeting at the gas station on March 12, he also observed that Torres paced back and forth in the McDonald's parking lot during the meeting at the gas station. While Torres was pacing, he would intermittently watch the meeting and look in other directions, apparently surveilling the area surrounding the McDonald's parking lot. Jacobs had also searched the Buick in which Garcia and Gallego arrived at the gas station. Inside the Buick, Jacobs found two loaded firearms and police paraphernalia such as badges, handcuffs, and t-shirts bearing the SWAT (i.e. Special Weapons and Tactics) team logo.

Gallego, who had entered a guilty plea in this case, testified that he had committed over 15 robberies since he moved to the United States from Cuba in

7

2006, and that some of his robberies had involved marijuana grow-houses. He had committed numerous robberies with Crespo, Torres, Garcia, and Serrano before he participated in the robbery in the present case. During their crimes, they would use an individual appointed to be a "look-out" to watch for the police. They carried guns during the robberies for protection in case the homes or grow-houses they targeted were guarded by other armed individuals. Gallego and Garcia "almost always" were in charge of carrying the guns. All of the participants, however, would carry guns during the robberies. Gallego identified a pistol that Jacobs had found in the Buick as a gun owned by Torres, and stated that he (Gallego) had carried this gun with him during previous robberies. During the previous robberies, Gallego, Torres, Crespo, Garcia, and Serrano had usually dressed in police uniforms.

Gallego further testified that, prior to March 12, he met with Crespo, who informed him of the details for the planned robbery. Immediately before the meeting at the gas station on March 12, he, Torres, Garcia, and Serrano had met at the Cookie Dollar Store, where they discussed the details of the robbery. The group waited at the store until they received a telephone call from Crespo and, after receiving Crespo's telephone call, they left to meet with the rest of their group. During this trip, Torres called them to inform them of their next meeting place near

8

McDonald's. Once they all arrived at McDonald's and a nearby gas station, Torres called Gallego and informed him that Crespo, Zamora, and Serrano "were all together with the people with whom the robbery was going to be done." Finally, just before they were arrested, Torres again called Gallego and told him that "this thing was looking good," and that they should leave McDonald's.

Garcia, who had also entered a guilty plea in this case, testified that, at the March 12 meeting at the Cookie Dollar Store, Serrano informed him that Crespo did not want him (Garcia) to participate in the robbery. Torres offered to let Garcia take over his role in the robbery and split Torres's proceeds.

Julio Estopinan, a detective employed by the Miami-Dade Police Department, testified that he assisted in the investigation of this case by conducting surveillance. After Garcia-Barzaga was arrested on March 12, 2008, he made a statement to the police. In his statement, Garcia-Barzaga averred that, while he did not possess a firearm, he was aware that the individuals who were going to conduct the robbery would be armed because they had to confront an armed body guard who would accompany the drug courier.

After the government rested its case, Torres and Crespo moved for a judgment of acquittal as to all counts of the indictment. Garcia-Barzaga moved for a judgment of acquittal as to Count 6, among other counts. The district court

9

denied their motions, finding that the evidence was sufficient to permit the jury to find that they were guilty of all counts charged in the indictment.

## II.

According to Crespo's presentence investigation report ("PSI"), he had been convicted of numerous crimes of violence. These prior offenses included convictions for battery, aggravated stalking, aggravated burglary, and tampering with a witness, victim, or informant. Many of these convictions arose out of domestic disputes between Crespo and his live-in girlfriend. In addition, Crespo had been convicted of aggravated burglary with a deadly weapon. According to the arrest report for this offense, Crespo and another individual had gained entry into the victim's home by asking for water, and then tied the victim up while they took approximately $4,200 and other valuables out of the victim's home.

The district court held a joint sentencing hearing for Crespo and Garcia-Barzaga. At sentencing, the parties and the court agreed that, due to Crespo's status as a criminal offender, his total offense level was 37, and his criminal history category was VI. The parties further agreed that Crespo's guideline range was 360 months' to life imprisonment. The court noted that Crespo was subject to a statutory mandatory minimum sentence of 60 months' imprisonment as to Count 6, which was to run consecutively to any other term of imprisonment imposed. The

court also noted that Crespo had been a "principal participant" in the present offense.

After hearing argument from the parties, the court stated that it had considered Crespo's advisory guideline range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a). The court sentenced Crespo to a total term of 420 months' imprisonment and ordered him to pay a $10,000 fine.

**III.**

We review a district court's decision regarding the admissibility of evidence for abuse of discretion. United States v. Schlei, 122 F.3d 944, 990 (11th Cir. 1997).

Under Fed.R.Evid. 404(b):

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed.R.Evid. 404(b).

Only extrinsic evidence is subject to the requirements of Fed.R.Evid. 404(b). Schlei, 122 F.3d at 990. "Evidence, not part of the crime charged but pertaining to

11

the chain of events explaining the context, motive, and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." United States v. Edouard, 485 F.3d 1324, 1344 (11th Cir. 2007) (quotation and alteration omitted). Such evidence "is not extrinsic under Rule 404(b), and thus falls outside the scope of the Rule. Id. (quotation omitted); United States v. Richardson, 764 F.2d 1514, 1521 (11th Cir. 1985) ("[t]hese prior wrongs were not extrinsic to the charged crimes because the evidence concerning prior crimes was inextricably intertwined with the evidence of the charged crime"). We have held that evidence of a defendant's previous drug smuggling activities was intrinsic to the charged crime where this evidence: (1) explained why another drug smuggler was willing to assist the defendant in the crime with little or no advance notice; and (2) rebutted the defendant's defense that he had merely accompanied another individual who was engaged in drug smuggling. United States v. Foster, 889 F.2d 1049, 1052-53 (11th Cir. 1989).

"[E]vidence of criminal activity other than the charged offense, whether inside or outside the scope of Rule 404(b), must still satisfy the requirements of Fed.R.Evid. 403." Edouard, 485 F.3d at 1344. Rule 403 provides, in part, that relevant evidence "may be excluded if its probative value is substantially

12

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R.Evid. 403. "In evaluating the district court's ruling under Rule 403, we view the evidence in the light most favorable to admission, maximizing its probative value and minimizing its undue prejudicial impact." United States v. Bradberry, 466 F.3d 1249, 1253 (11th Cir. 2006). "The court's discretion to exclude evidence under Rule 403 is narrowly circumscribed . . . Rule 403 is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence." United States v. Church, 955 F.2d 688, 700 (11th Cir. 1992) (quotation and alteration omitted).

Here, the district court did not abuse its discretion in admitting evidence of the defendants' previous robberies because this evidence was intrinsic to the charged offenses. First, this evidence provided an explanation for why these particular defendants joined together and agreed to rely on each other to commit an armed narcotics robbery. In addition, this evidence also explained details such as why Torres offered to share his proceeds of the offense with Garcia, how Garcia and Gallego could identify Torres's gun, and why the defendants had police paraphernalia in the Buick on March 12. Importantly, this evidence served to counter Torres's and Crespo's arguments that they were unaware of the object of the conspiracy and merely associated with individuals who were planning an

13

armed robbery. Finally, Gallego's statement that they typically used a "look-out" in previous crimes provided a possible explanation for Torres's pacing and apparent surveillance in the McDonald's parking lot on March 12.

Moreover, the district court did not abuse its discretion in admitting this evidence under Fed.R.Evid. 403. For the reasons above, this evidence had substantial probative value. In addition, in light of the substantial evidence that Crespo and Torres were involved in the present offense, they cannot demonstrate that this evidence was so prejudicial that it warranted Rule 403's "extraordinary remedy" of excluding probative evidence.

**IV.**

As noted above, we review a district court's decision regarding the admissibility of evidence for abuse of discretion. Schlei, 122 F.3d at 990. Testimony in the form of opinions or inferences of a witness who is not testifying as an expert is:

> limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of [Fed.R.Evid.] 702.

Fed.R.Evid. 701. A lay witness may, however, clarify conversations that are "abbreviated, composed with unfinished sentences and punctuated with ambiguous

14

references to events that were clear only to the defendant and the witness." United States v. Awan, 966 F.2d 1415, 1430 (11th Cir. 1992) (quotation and alterations omitted). We have held that such testimony is permissible where it assists the jury in understanding words and phrases it otherwise would not understand, and is provided by a witness who was a party to the conversation he interprets for the jury. See id.

Here, the district court did not abuse its discretion by permitting Espinosa to testify as to his impressions and interpretations concerning recorded conversations to which he was a party. Because Garcia-Barzaga, Crespo, Zamora, and Espinosa used coded words and phrases referring to the drug trafficking business during the March 3, 2008, meeting, it was reasonable for the court to permit Espinosa to explain his interpretation of these phrases to the jury, particularly since he was a party to the conversation.

## V.

We "review the sufficiency of the evidence presented at trial de novo." United States v. LeCroy, 441 F.3d 914, 924 (11th Cir. 2006). "The evidence is viewed in the light most favorable to the government, with all inferences and credibility choices drawn in the government's favor." Id. "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly

15

inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." United States v. Young, 906 F.2d 615, 618 (11th Cir. 1990).

The government may use circumstantial evidence in order to prove the elements of conspiracy. Id. at 1426. "It is not necessary for the government to prove that a defendant knew every detail or that he participated in every stage of the conspiracy." United States v. Jones, 913 F.2d 1552, 1557 (11th Cir. 1990). Rather, the government need only prove that the defendant knew "of the essential nature and scope of the enterprise and intend[ed] to participate." United States v. Calderon, 169 F.3d 718, 723 (11th Cir. 1999) (quotation omitted). A defendant's association with individuals engaged in a conspiracy, standing alone, does not establish that the defendant participated in the conspiracy. United States v. Arbane, 446 F.3d 1223, 1233 (11th Cir. 2006). While a defendant's mere presence at a crime scene is insufficient to sustain a conviction for conspiracy, this Court has held that presence "is material, highly probative, and not to be discounted." United States v. Gamboa, 166 F.3d 1327, 1332 (11th Cir. 1999) (quotation omitted).

In order to establish that a defendant is guilty of attempt to commit an offense, the government must show that the defendant: (1) had the specific intent to commit the offense; and (2) took a substantial step toward committing the offense.

16

United States v. Forbrich, 758 F.2d 555, 557 (11th Cir. 1985).  "To find that a substantial step was taken, the court must determine that the defendant's objective acts mark the defendant's conduct as criminal so that the defendant's acts as a whole strongly corroborate the required culpability."  Id.

### i.    Torres's and Crespo's convictions as to Counts 1 and 2

In order to show that a defendant is guilty of conspiracy to possess with intent to distribute cocaine, the government must show that (1) two or more persons came to a mutual understanding to try to accomplish a common and unlawful plan; (2) each defendant, knowing of the unlawful purpose of the plan, joined in voluntarily; and (3) the object of the unlawful plan was to possess with intent to distribute five or more kilograms of cocaine.  21 U.S.C. §§ 846, 841(b)(1)(A); United States v. Silvestri, 409 F.3d 1311, 1328 (11th Cir. 2005).

In order to demonstrate that a defendant is guilty of attempt to possess with intent to distribute cocaine, the government must show that the defendant "(1) acted with the kind of culpability required to possess cocaine knowingly and willfully and with the intent to distribute it; and (2) engaged in conduct which constitutes a substantial step toward the commission of the crime under circumstances strongly corroborative of their criminal intent."  United States v. McDowell, 250 F.3d 1354, 1365 (11th Cir. 2001).

17

Here, the evidence was sufficient to establish that Crespo conspired to possess with intent to distribute cocaine, and attempted to possess with intent to distribute cocaine. Specifically, the evidence demonstrated that Crespo: (1) attended the March 3 meeting with Garcia-Barzaga, Espinosa, the CI, and Zamora, where he joined in the discussion concerning how to conduct the narcotics robbery of over 25 kilograms of cocaine; (2) called Gallego, Garcia, Torres, and Serrano while they were at the Cookie Dollar Store on March 12 and instructed them to meet him near the McDonald's; (3) arrived at the meeting spot near McDonald's, where he again discussed the robbery with his co-conspirators; and (4) traveled to the warehouse where Espinosa was allegedly waiting to receive the address of the stash house. Based on this evidence, the jury reasonably could have found Crespo knowingly joined in a conspiracy to possess with intent to distribute narcotics, and took a substantial step toward committing this crime by arriving at the McDonald's on March 12 and then traveling to Espinosa's warehouse.

The evidence also showed that Torres: (1) discussed the narcotics robbery with Gallego, Garcia, and Serrano at the Cookie Dollar Store; (2) traveled to the McDonald's on March 12, where he acted as a look-out for his co-conspirators; (3) communicated with Gallego concerning the scheme during the trip to McDonald's; and (4) supplied a gun to be used during the robbery. Based on this

18

evidence, the jury reasonably could have found that Torres knowingly joined in a conspiracy to possess with intent to distribute cocaine, and took a substantial step toward committing this offense by traveling to McDonald's, acting as a look-out, and supplying a gun to use during the robbery.

### ii. *Torres's and Crespo's convictions as to Counts 3 and 4*

Under 18 U.S.C. § 1951(a) (i.e., the Hobbs Act), it is illegal for anyone to attempt or conspire to obstruct, delay, or affect commerce or the movement of any article or commodity in commerce. 18 U.S.C. § 1951(a); United States v. Taylor, 480 F.3d 1025, 1026-27 (11th Cir. 2007). "The two required elements for a substantive Hobbs Act conviction are robbery and an effect on interstate commerce." Taylor, 480 F.3d at 1026-27 (quotation and alteration omitted). "The interstate nexus for a Hobbs Act conspiracy can be proved by showing a potential impact on interstate commerce." Id. at 1027 (quotation and alteration omitted). In Taylor, we held that the interstate nexus element was satisfied where the defendant was involved in a reverse sting operation to commit an armed narcotics robbery. Id. at 1026-27. We further held that "[t]he fact that the intended victims and narcotics were fictional [was] irrelevant." Id. at 1027.

Based on the facts set forth in the preceding section, the jury reasonably could have found that both Torres and Crespo knowingly joined in a plan to rob

Espinosa, and took a substantial step toward that crime by, among other things, arriving at the McDonald's to await further instructions. Although the co-conspirators never learned of the exact time and place of the robbery, this fact is irrelevant – there is no requirement that a defendant know every detail of how an offense will be committed before he can be deemed to have conspired or attempted to commit the offense. Furthermore, in light of our holding in Taylor, the Hobbs Act's interstate nexus requirement was satisfied here even though there was no actual cocaine or stash house.

### iii. Torres's and Crespo's convictions as to Counts 5 and 6, and Garcia-Barzaga's conviction as to Count 6

We have held that, in order "to sustain a conviction under [18 U.S.C.] § 924(c), the government must show that, during and in relation to their conspiracy to rob cocaine, defendants used, carried, or possessed a firearm in furtherance of that conspiracy." United States v. Gunn, 369 F.3d 1229, 1234 (11th Cir. 2004). A defendant may be liable for a co-conspirator's possession of a gun where that possession was reasonably foreseeable to the defendant. Id. In addition, a defendant may be liable under § 924(c)(1)(A) if he aids, abets, counsels, commands, induces or procures the use of a firearm during a crime of violence or drug trafficking offense. 18 U.S.C. § 2; United States v. Thomas, 987 F.2d 697, 701-02 (11th Cir. 1993); Bazemore v. United States, 138 F.3d 947, 949 (11th Cir.

20

1998) (§ 2255 context). In order to prove that a defendant aided and abetted another individual in violation § 924(c)(1)(A), the government must show "that a substantive offense was committed, that the defendant associated himself with the criminal venture, and that he committed some act which furthered the crime." United States v. Hamblin, 911 F.2d 551, 557 (11th Cir. 1990). In addition to the requirement that a defendant have knowledge that a gun will be used, "there must be some proof linking the defendant to the gun, because section 924(c) does not permit guilt by association." Thomas, 987 F.2d at 702; Bazemore, 138 F.3d at 949. A defendant should not, however, knowingly benefit from the use of a gun and then evade liability for its presence. Id. at 950.

We have held that a defendant could be convicted under § 924(c)(1)(A) because he organized a narcotics robbery that involved guns, even though he did not arrive at the scene of the intended robbery in the vehicle that contained the guns. Gunn, 369 F.3d at 1235. We reasoned that "a rational jury could have inferred that he, directly or through others, controlled-or at least had the power and intention to control-the firearms." Id.

Here, there was ample evidence to support the jury's determination that Garcia-Barzaga aided or abetted his co-conspirators in possessing a gun in furtherance of the narcotics robbery. At the March 3 meeting, Garcia-Barzaga

21

constantly referred to the fact that the robbery would likely be violent, and that the individuals conducting the robbery would probably need to shoot in order to protect themselves. In his statement to the police, Garcia-Barzaga expressly admitted that he knew that the men committing the robbery would carry guns. Accordingly, Garcia-Barzaga clearly was aware that the narcotics robbery would involve a gun. In addition, when Garcia-Barzaga met with the co-conspirators near the McDonald's on March 12, he instructed them to shoot if an individual accompanying Espinosa shot at them. Thus, he counseled the use of a firearm during a violent offense. Accordingly, it is reasonably clear that Garcia-Barzaga aided or abetted his co-conspirators in using a firearm in furtherance of a violent offense and a drug trafficking offense, and that there also was a link between him and the firearms used in this case.

In addition, there was also substantial evidence to support the jury's determination that Torres was guilty of Counts 5 and 6. As noted above, Torres participated in the Cookie Dollar Store meeting on March 12 to plan the robbery, and one of the guns found in Gallego and Garcia's car belonged to him. Accordingly, the jury could have inferred that Torres knew that a gun was going to be used in the narcotics robbery. Moreover, there was clearly a link between Torres and the one of the guns used in the attempted robbery because he owned

one of these guns.

Finally, there was also substantial evidence to support the jury's determination that Crespo was guilty of Counts 5 and 6. Due to Crespo's participation in the March 3 meeting, at which the parties repeatedly discussed the use of guns during the robbery, the jury could have found that Crespo was aware that he was participating in an offense that involved the use of a gun. Moreover, Crespo participated in planning the armed robbery and informed Gallego of the details of the planned robbery. Gallego left the Cookie Dollar Store with the guns only after receiving a telephone call from Crespo. Thus, the jury reasonably could have inferred that Crespo was linked to the guns in this case because he helped plan the armed robbery.

## VI.

After United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), "a sentence may be reviewed for procedural or substantive unreasonableness." United States v. Hunt, 459 F.3d 1180, 1182 n.3 (11th Cir. 2006). We review a defendant's sentence for reasonableness. Gall v. United States, 552 U.S. 38, __, 128 S.Ct. 586, 594, 169 L.Ed.2d 445 (2007); United States v. Talley, 431 F.3d 784, 785 (11th Cir. 2005). Review for reasonableness is deferential. Talley, 431 F.3d at 788. The reasonableness of a sentence is reviewed

23

under an abuse-of-discretion standard regardless of whether the sentence imposed is inside or outside a defendant's guideline range. United States v. Pugh, 515 F.3d 1179, 1189-90 (11th Cir. 2008) (citing Gall, 552 U.S. at __, 128 S.Ct. at 597). Under the abuse-of-discretion standard, we will reverse only if the district court made a clear error of judgement. Id. at 1191.

A sentence is procedurally unreasonable if the district court failed to calculate or incorrectly calculated the Guidelines, treated the Guidelines as mandatory, failed to consider the factors set forth in 18 U.S.C. § 3553(a), selected a sentence based on clearly erroneous facts, or failed to explain adequately the chosen sentence. Gall, 552 U.S. at __, 128 S.Ct. at 597. Section 3553(a) provides that district courts imposing a sentence must consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to: (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, (B) deter future criminal activity, (C) protect the public, and (D) provide the defendant with needed educational or vocational training or medical care; (3) the kinds of sentences available; (4) the Sentencing Guidelines range; (5) pertinent policy statements of the Sentencing Commission; (6) the need to avoid unwanted sentencing disparities; and (7) the need to provide restitution to victims. See 18 U.S.C. § 3553(a). While the record

should reflect that the district court adequately considered the § 3553(a) factors, the court is not required "to recite a laundry list of the § 3553(a) factors," or discuss each of the § 3553(a) factors. United States v. Scott, 426 F.3d 1324, 1329-30 (11th Cir. 2005).

"[A] sentence may be substantively unreasonable, regardless of the procedure used." Hunt, 459 F.3d at 1182 n.3. The party challenging the sentence "bears the burden of establishing that the sentence is unreasonable in the light of [the] record and the factors in section 3553(a)." Talley, 431 F.3d at 788. We have recognized that "there is a range of reasonable sentences from which the district court may choose." Id. Where the court imposes a sentence that is within the guidelines range, we ordinarily expect that sentence to be reasonable. Id.

Here, Crespo's sentence was procedurally reasonable because the district court: (1) correctly calculated his guideline range, a conclusion that Crespo does not dispute on appeal; (2) clearly stated that it had considered the § 3553(a) factors; and (3) treated the Guidelines as advisory. Moreover, the record demonstrates that the court gave sufficient consideration to the unique facts of Crespo's case, as it considered Crespo's status as a "principal participant" in the offense, as well as his history of violent crime and the need to protect the public from future violent crimes. As a result, Crespo's sentence was procedurally

25

reasonable.

Crespo's sentence also was substantively reasonable. As noted above, the record demonstrates that Crespo had a history of violent crime. Moreover, as the court noted, Crespo was a "principal participant" in the present offense, as he participated in planning the offense and even volunteered that the robbery crew could wear his police gear. In addition, Crespo knew that the offense would involve guns, and that there was a significant probability that the guns would be used during the robbery because the drug courier would likely be accompanied by an armed individual. Accordingly, in light of the facts of this case and Crespo's violent history, Crespo has failed to meet his burden of demonstrating that his sentence was substantively unreasonable.

## Conclusion

Based on our review of the record and the parties' briefs on appeal, we affirm.

**AFFIRMED.**